ENOUS O'NEAL JR. *v.* STATE OF ARKANSAS

5729                                                     487 S.W. 2d 618

Opinion delivered December 11, 1972

*Ralph C. Murray* and *Garland Q. Ridenour*, for appellant.

*Ray Thornton*, Atty. Gen., by: *John D. Bridgforth*, Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. Enous O'Neal, Jr. was convicted of the crime of murder in the first degree and his punishment assessed at death in the electric chair. From the judgment so entered, appellant brings this appeal. The killing occurred on the night of March 1, 1971, appellant shooting Robert Nathan. Following the shooting, O'Neal immediately went to Chicago, Illinois, but, ac-

cording to testimony, called Phillips County officers, and told them where he was located, after which the Arkansas officers contacted the Chicago Police Department, advising that they held a warrant for O'Neal, and asking the Chicago police to take him into custody. Officer Lawhon, a Deputy Sheriff of Phillips County, testified that O'Neal was advised of his rights at that time; that subsequently he called O'Neal, at which time, two of O'Neal's brothers talked with him and Lawhon again talked with him, advising that they held a first degree murder warrant for his arrest. Lawhon stated that O'Neal told him that he killed Nathan but that it was an accident. Detective Patrick Carroll of the Criminal Investigation Division of the Chicago Police Department, testified that he, along with other officers, in response to the message from the Arkansas officers, went to 5714 South Wabash in Chicago where they found the defendant; that they explained to him that they had a warrant for his arrest and he was at that time orally advised of his constitutional rights. A woman, Fanny Mae Hunt, was with the defendant and the officers were told that she was his wife. O'Neal was taken to a police station and again informed of his constitutional rights with a "Miranda" card. O'Neal was also told that his automobile was allegedly involved, at which time he stated that the car was being repaired, giving the location of the garage, and appellant further stated that he had nothing to hide and gave the officers permission to search the house and the car, giving Detective Carroll the keys to the automobile. Both O'Neal and Miss Hunt stated that she was a co-owner of the car and Miss Hunt accompanied the officers when the car was searched. The door was opened with a key and a search made of the inside of the automobile and no weapon was found. The officers checked under the hood and then tried the key to the trunk lock which would insert but would not turn. The back seat was then taken out of the car interior and the officers could view what appeared to be a gun case butt. Miss Hunt did not have her keys and the officers advised that they would like to search the trunk and would replace the lock, and she gave her permission. Upon forcing the trunk lid, a shotgun wrapped in sheets was observed and taken from the car. Subsequent investigation and tests established that this was the weapon that

fired the shots that killed Nathan. For reversal, it is first asserted that appellant's motion to suppress the shotgun as evidence should have been granted since there was no warrant obtained for the search. We find no merit in this contention for we think it is clearly shown that appellant waived the requirement of a warrant. On trial, O'Neal testified that he did not give his permission, but Carroll and M. F. Caccitiolo, a Chicago police officer, both testified that O'Neal and the co-owner of the car, Miss Hunt, did grant permission, and that the keys were handed to the officers. See *Dokes* v. *State*, 241 Ark. 720, 409 S.W. 2d 827; *Asher & Bradford* v. *City of Little Rock*, 248 Ark. 96, 449 S.W. 2d 933, and cases cited therein. The trial court found that consent had been given and we are of the opinion that the evidence supports that finding. Actually, it would not appear that the taking of the shotgun, and its subsequent introduction into evidence could have been prejudicial for O'Neal did not deny the shooting; rather he admitted that he shot Nathan, but said that he was firing at a deer and accidentally hit this companion.

It is next asserted that the court erred in excluding for cause two jurors who were opposed to capital punishment. This contention is based on the case of *Witherspoon* v. *Illinois*, 391 U.S. 510, 20 L. ed. 2d 776, 88 S. Ct. 1770. We cannot agree that that case is controlling in the present instance for the two jurors both emphatically answered, during the *voir dire* examination, that they would not vote for the death penalty. One answered "No" and the other, when asked "Do those words mean that you just would not vote for the death penalty?", replied, "Yes sir, because I don't believe in it".

It is next asserted that the trial court erred in overruling the motion to suppress as evidence certain statements and admissions made by appellant for the reason that there was no showing that the *Miranda* warnings had been given. We have already commented that the Chicago police officers testified that O'Neal was informed of his constitutional rights as required in *Miranda* v. *Arizona*, 384 U.S. 436, 16 LEd 2d 694, 86 S. Ct. 1602, not once, but twice. The evidence further shows that when Police Chief Kenneth Winfrey of

the Helena Police Department and Deputy Sheriff Lawhon took appellant into custody for the purpose of returning him to Arkansas, that he was again advised of his rights by both of the officers. According to their testimony, on the return trip, O'Neal several times voluntarily and of his own accord, made statements referring to the shooting to the effect that he killed Nathan, but said it was an accident. Lawhon said that three of four days after O'Neal was placed in jail, he sent work that he wished to talk with Lawhon and that officer, accompanied by Deputy Sheriff Gunn, went to the jail and appellant stated that he desired to tell them how the killing occurred. According to Lawhon:

> "He said that 'I killed Bugeye,' as he referred to him, Robert Nathan. 'But it was not murder, it was an accident.' Said, 'Up there in the curve on Springdale Road,' said, 'You know, that's a deer crossing there and a deer come across the road,' and said, 'I got out and took the shotgun and just as I through [threw] upon the deer, Bugeye,' who was Robert Nathan, 'ran in between us and he took the charge of shot and that's what killed him.' *** 'I told Enous—I said, 'Enous, the body was X-rayed and there were two loads of shot went into this man. I recovered quite a few Number 6 shot from the lower throat area here.' Or in my opinion I figured they were Number 6. 'And could you explain the second shot,' Mr. Gunn, Deputy Sheriff Gunn was standing there with me. He said, 'Yeah, he was laying there kicking and I shot him again to get him out of his misery.' "

The evidence was overwhelming that O'Neal was advised of his constitutional rights and the statements made were entirely voluntary.

Next, error was asserted due to the admission of the shotgun, a spent shell, the shirt of the deceased and certain photographs of the automobile taken in Chicago. It might be mentioned that no objection was made to the introduction of the shell and the shirt and we again mention that the introduction of the shotgun (or the shell)

could not have been prejudicial, since O'Neal himself testified that he killed Nathan with the shotgun. The shirt was introduced by Officer Lawhon who testified that he, with other officers, cut it off the body at the hospital. The testimony reflected that the shirt had blood on it and two holes made by a shotgun in it, and certainly was admissible as reflecting the manner of the killing, the evidence also reflecting that the shirt had been in the possession of Chief Winfrey since being taken. Officer Caccitiolo testified that the shotgun was the same one found in appellant's car, the identification being based on the fact that the serial number on the gun was the same as recorded in his report. After being turned over to Deputy Lawhon, the gun was returned to Helena, where it remained in the Sheriff's office. The Chicago Police Department also placed an identification mark above the wood portion of the gun. There was no error in permitting these exhibits to be introduced. As to the photographs, Carroll testified that he was present when the pictures were taken and that they were a true and correct representation of the car and the shotgun as he found them. We have said on numerous occasions that the admissibility of photographs is largely within the discretion of the trial court. See *Davis* v. *State*, 246 Ark. 838, 440 S.W. 2d 344, and cases cited therein.

It is asserted that the court erred in permitting the testimony of Chief of Police Kenneth Winfrey relative to entry and exit wounds. Winfrey, using photographs, explained where the shot entered and where they left the body, and appellant contends that Winfrey was not an expert and accordingly not qualified to testify on this particular matter. We disagree. The evidence reflected that Winfrey had served as Chief of Police of the Helena Police Department for two and one-half years, had formerly served with the Arkansas State Police, and had previous experience in gunshot cases dealing with entry and exit wounds. The witness testified that he had examined the body (after which photographs were taken) and he very clearly ex-

plained how he reached the determination testified to.[1] No error was committed in permitting this testimony.

Next, it is contended that the court erred in admitting into evidence pictures of the deceased for the reason that they were of no probative value, and were prejudicial. We do not agree for we think the photographs were an aid to the jury in understanding the testimony. In *Williams* v. *State,* 250 Ark. 859, 467 S.W. 2d 740, this court said:

> "The admission and relevancy of photographs must necessarily rest largely in the discretion of the trial judge. Admissibility of photographs does not depend upon whether the objects they portray could be described in words, but rather on whether it would be useful to enable the witness better to describe and the jury better to understand, the testimony concerned. Where they are otherwise properly admitted, it is not a valid objection to the admissibility of photographs that they tend to prejudice the jury. Competent and material evidence should not be excluded merely because it may have a tendency to cause an influence beyond the strict limits for which it is admissible. *Oliver* v. *State,* 225 Ark. 809, 286 S.W. 2d 17; *Smith* v. *State,* 216 Ark. 1, 223 S.W. 2d 1011 (cert. den. 339 U.S. 916); *Jones* v. *State,* 213 Ark. 863, 213 S.W. 2d 974.

> Photographs are admissible for the purpose of describing and identifying the premises which were the scene of the crime, and may also be admitted to establish the *corpus delicti* of the crime charged, to disclose the environment and to *corroborate testimony.* *Stewart* v. *State,* 233 Ark. 458, 345 S.W. 2d 472 (cert. den. 368 U.S. 935)."

It is next asserted that the trial court erred in not

---

[1] From the record: "In many cases, Mr. Raff, the type of wound—expecially where it goes through clothing or some object prior to the entry into the flesh, the direction of travel will throw the material or whatever other objects it may hit in that direction upon entrance. On exit, everything is blown away from the wound, an outward position rather than being in an inward position, one of the important factors in determining an entrance wound and exit."

discharging appellant because he had been in jail for more than two terms of the court without having been brought to trial. We do not agree. In *Stewart* v. *State,* 13 Ark. 720, this court, through Cheif Justice Watkins in interpreting a section identical with our present statute, Ark. Stat. Ann. § 43-1708 (Repl. 1964), stated:

> "The unavoidable construction of it is, that, in order to entitle the accused to be discharged for such cause, there must be, on the part of the State, *a failure of three terms to bring him to trial, that is to say, at the end of the second term which shall be held after the finding of the indictment.* [our emphasis]"

This is still the law, the recent opinion in *Holland* v. *State,* 252 Ark. 730, 480 S.W. 2d 597, not overruling this portion of the *Stewart* opinion. Ark. Stat. Ann. § 22-310 (Supp. 1971) sets out the terms of the Phillips County Circuit Court, and for the year 1971, these terms would have commenced on March 15, May 24, September 13, and November 22. Apparently, though the record is not entirely clear, O'Neal was returned to Arkansas the first part of May, and on May 7, entered his plea of not guilty and the court appointed counsel to represent him; at that time the case was set for trial for May 31. However, on May 20, appellant filed a motion for psychiatric examination and this motion was granted. Again, though the record is not completely clear, it appears that the case was not tried during the September term because of the fact that the material witnesses for the state were not present, and the case was continued. It was tried during the November term. Summarizing, the case was not tried during the March term, but under *Stewart,* the state was obligated to try him within the next two terms. As previously stated, the case was not tried during the May term because of the application of O'Neal for psychiatric examination; accordingly, this term does not count against the state. He was not tried during the September term because of the state's motion for continuance, but was then tried in the November term which is clearly a trial within two terms, not counting the first term, and not counting the continuance granted on appellant's motion.

Appellant complains that reversible error was committed by the prosecution because of statements made during the closing argument. The record does not reveal that any objections were made to these allegedly prejudicial statements at any time prior to the return of the verdict, and we cannot consider this point. See *Jones* v. *State,* 248 Ark. 694, 453 S.W. 2d 403.

Finally, it is asserted that the jury did not deliberate a sufficient length of time before arriving at its decision. We know of no statute that requires a particular time of deliberation, and certainly the amount of time taken, or lack of it, does not indicate prejudice; to the contrary, it would only indicate that the evidence was clear and substantial. Each juror was polled by the court when the verdict was returned, and each stated that he found appellant guilty of the crime of murder in the first degree.

It follows from what has been said, that we find no reversible error.

However, the United States Supreme Court, in the case of *Furman* v. *Georgia,* 408 U.S. 238 (1972), held that where a jury is permitted to determine whether a defendant should receive a punishment of life imprisonment or death, the death penalty constitutes "cruel and unusual punishment" and that this interpretation is applicable to the several states through the Fourteenth Amendment. It is thus mandatory that appellant's sentence be reduced from death to life imprisonment as being the next highest available penalty. Ark. Stat. Ann. § 43-2308 (Repl. 1964). Accordingly, the cause is remanded to the Phillips County Circuit Court for re-sentencing in accordance with this opinion.

It is so ordered.